IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL JOSEPH WHEATLEY, )
)
Plaintiff, )
)            No. 14 C 5161
v. )
)            Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Michael Joseph Wheatley, seeks reversal and remand of the final decision of the

Commissioner of Social Security ("Commissioner") (doc. # 13). The Commissioner filed a

motion seeking affirmance of the decision denying benefits (doc. # 21). For the following

reasons, we affirm the decision.

## I.

Mr. Wheatley applied for benefits on March 23, 2010, alleging that he became disabled

beginning on February 18, 2008. After his claim was denied initially and on reconsideration, Mr.

Wheatley appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on

February 14, 2012. The ALJ issued an opinion denying benefits on April 2, 2012 (R. 147-57).

On appeal, the Appeals Council ruled that the ALJ erroneously treated Mr. Wheatley's date last

insured for purposes of the Social Security Act (the "Act") as December 31, 2010, a year before

the correct last insured date of December 31, 2011; on that basis, the Appeals Council remanded

---

[1]On July 23, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 10).

the case to the ALJ for consideration of the evidence from January 1, 2011, to December 31, 2011 (R. 163-64).

The ALJ obtained additional evidence and held another hearing on June 7, 2013. On June 28, 2013, in a second written opinion, the ALJ found Mr. Wheatley was not disabled from his alleged onset date through December 31, 2011 (R. 27). Mr. Wheatley appealed, and this time the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

## II.

We review the medical evidence, the testimony at the two hearings and the two written opinions issued by the ALJ chronologically below.

## A.

Mr. Wheatley filed for disability benefits when he was 39 years old, alleging that he became too disabled to work in his long-time construction supervisor job on February 18, 2008, when he was in a car accident in which he was thrown to the side and hit his head on the driver's side window (R. 570). After the accident, Mr. Wheatley suffered from severe headaches, and severe neck and back pain (R. 470-72). An MRI of Mr. Wheatley's cervical spine (upper spine/neck) in March 2008 showed mild abnormality and a "tiny" disc herniation (R. 576), and a CT scan of his head was negative (R. 471). He initially took non-steroidal anti-inflammatory drugs (NSAIDs) and muscle relaxants, but these made him sleepy and weak so he stopped taking them and instead began taking non-prescription medication (Aleve, ibuprofen and Excedrin migraine) for pain (R. 469, 573-74). In nine sessions of physical therapy between April 15, 2008 and June 5, 2008, Mr. Wheatley reported that his pain remained at a level of 5 out of 10, and his cervical range of motion ("ROM") had decreased (R. 577, 579).

An MRI taken of Mr. Wheatley's lumbar spine (lower back) on August 8, 2008 showed bulging discs and facet abnormality (arthropathy) at L4-5 and L3-4 levels, with moderate to moderately severe foraminal (spinal nerve roots) narrowing and mild central canal narrowing (stenosis) (R. 569). Despite an epidural injection on August 12, 2008 (R. 586), Mr. Wheatley was admitted to the hospital on August 14, 2008 due to severe back pain radiating down his left leg (R. 591). A CT of his lumbar spine on August 15, 2008 confirmed the MRI's findings (R. 594). Mr. Wheatley was discharged four days later, after his pain had decreased (R. 587).

Physical therapy visits in August and September 2008 did not relieve Mr. Wheatley's low back pain (R. 651). In October 2008, Mr. Wheatley saw Cary Templin, M.D., at Hinsdale Orthopaedics, complaining of neck and back pain with pain radiating into his legs, which he rated at a level of 4 to 6 out of 10 (R. 701-02). Dr. Templin noted that Mr. Wheatley's cervical ROM was limited slightly and his lateral rotation was limited to about to 50 degrees bilaterally, but that he had good strength and lumbar ROM, albeit with pain on extension (Id.).

Mr. Wheatley started seeing Suleiman Salman, D.O., for pain management on November 18, 2008 (R. 659). Mr. Wheatley described his neck, low back and leg pain as continuous in nature, exacerbated by prolonged sitting and standing. Dr. Salman performed a left L4-L5 epidural steroid injection (R. 662). On December 16, 2008, Dr. Salman repeated that injection and added a left L5-S1 epidural steroid injection (R. 669). Mr. Wheatley reported that these injections provided 30 to 40 percent pain relief of his left sided low back pain (R. 676). On January 9, 2009, Dr. Salman repeated the previous two injections and added a left sacroiliac joint (between lower spine and pelvis) steroid injection (Id.). These injections temporarily improved Mr. Wheatley's low back and left leg pain (R. 774). In April 2009, Dr. Salman prescribed a lidocaine anethestic patch and Arthrotec (an NSAID) for pain because Mr. Wheatley was unable

3

to tolerate Lyrica (anti-seizure medication), which caused him significant cognitive dysfunction (R. 679, 774).

At a follow-up visit to Hinsdale Orthopaedics on April 13, 2009, Mr. Wheatley complained of pain at a level of 4 out of 10, which spread across his neck, upper spine, left shoulder, and lower back and extended to his left buttock and thigh (R. 846). Mr. Wheatley had good ROM in his cervical spine, but limited flexion and pain on extension in his lumbar spine and his triceps and biceps were unresponsive (*Id.*). The doctor stated that Mr. Wheatley "has had good relief from the injections but not complete. The question in Michael is whether or not decompressive surgery would help him . . ." (*Id.*).

On April 30, 2009, Dr. Salman performed left L1 through L5 prognostic medial branch nerve blocks (R. 680). After Mr. Wheatley reported that the nerve blocks provided at least six hours of 50 percent or more pain relief of his left-sided low back pain, on May 8, 2009, Dr. Salman performed radiofrequency ablation (stunning with heat energy the nerves of a painful joint)[2] of the left L1 through L5 nerves (R. 686).

On May 29, 2009, Dr. Salman performed a C6-7 cervical epidural steroid injection to relieve Mr. Wheatley's neck pain (R. 691), but the injection did not provide him any pain relief (R. 784). On June 19, 2009, Dr. Salman prescribed Mr. Wheatley naproxen, Vicodin, and a Flector (NSAID) patch for pain (*Id.*). On June 26, 2009, Dr. Salman performed prognostic medial branch nerve blocks on Mr. Wheatley's right side, at C3 through C7 (upper cervical spine) (R. 694), but these did not provide any relief of his neck pain (R. 787). Dr. Salman opined that Mr. Wheatley's neck pain may be caused by myofascial pain (a chronic pain disorder). He

---

[2]Also referred to as radiofrequency neurotomy, in radiofrequency ablation, heat generated by radio waves is used to target specific nerves and temporarily interfere with their ability to transmit pain signals. The radio waves are delivered to the targeted nerves via needles inserted through the skin above the spine. http://www.mayoclinic.org/tests-procedures/radiofrequency-neurotomy/basics/definition/prc-20013452; *see also* http://healthletter.mayoclinic.com/content/preview.cfm?n=35.

renewed his prescriptions for a Flector patch, Vicodin, lidocaine patch, and naproxen, and added baclofen (a muscle relaxant), as tolerated (*Id.*). Dr. Salman noted that Mr. Wheatley had discontinued Elavil (nerve pain medication) because of sedation effects (*Id.*).

In July 2009, Mr. Wheatley's physical therapist noted that he still had some tenderness and limited ROM in his cervical and lumbar spine, mild to moderate left hamstring and quad radiating pain, and limited ability for sustained standing, walking and lifting (R. 602, 802-05). On August 3, 2009, Dr. Salman performed a left greater occipital nerve block (at the base of the skull) to treat Mr. Wheatley's neck pain and started him on Topamax (a pain medication generally used for seizures and migraines) (R. 703). Dr. Salman noted diffuse tenderness in Mr. Wheatley's upper to lower cervical spine, but no distinct trigger points (*Id.*). That month, Mr. Wheatley also had MRIs of his shoulders, which showed moderate AC (acromioclavicular) joint degenerative change, partial thickness tears, tendinopathy and a degenerative cyst formation (R. 704-05).

The record next picks up almost ten months later, on May 31, 2010, when Mr. Wheatley filled out a daily function report as part of the disability claim he filed in March 2010. Mr. Wheatley reported that each day he did some light exercise in his basement; took care of his personal hygiene; prepared sandwiches, frozen meals and oatmeal for himself; and went outside and walked the dog (R. 480-81). He cleaned dishes and mowed the lawn with a self-propelled mower about twice a week; did light dusting, laundry, and shopping about once a week; and fished once or twice a month (R. 481-83). Mr. Wheatley could carry groceries and laundry if it was "light enough" (R. 501). He could drive, but he did not go to the movies, take bike rides or long walks, or go on road trips because he could not stand or sit for long due to extreme pain in his back and legs (R. 479-80, 482-84,492). Mr. Wheatley wrote that he could stand, sit and walk

for 15 to 30 minutes (but would then need to rest for 30 to 60 minutes), lift 30 pounds from a squat, and sit for about 30 minutes before his back started to hurt (R. 484, 502). Most days, he had no problem getting up from a chair or getting out of bed, but sometimes he needed assistance due to the pain (R. 502).

On June 23, 2010, Mr. Wheatley saw Clay Canady at Bone & Joint Surgeons for pain after he re-aggravated an old ankle fracture the previous month while he was in Arkansas (R. 740). X-rays of his ankles showed some degenerative changes, lesions, cysts and spurs in his right ankle (R. 738-39). Dr. Canady noted pain and possible swelling, but excellent ROM (R. 741). He prescribed Etodolac (an NSAID) to treat Mr. Wheatley's ankle pain and recommended that he follow-up with a foot and ankle specialist (*Id.*).

On July 24, 2010, Albert Osei, M.D., performed a thirty minute Internal Medicine Consultative Examination of Mr. Wheatley at the request of the Department of Disability Services ("DDS"). Mr. Wheatley complained of constant lower back pain at a level of 4 out of 10, which increased to a level of 8 with strenuous activity, although taking Aleve reduced the pain to a 6 for a couple of hours (R. 744-45). He also complained of constant neck pain radiating into both shoulders, but it was manageable with Aleve at a level of 3 out of 10 (R. 745). Mr. Wheatley reported that he could walk up to 1/4 mile, stand for 15 minutes, sit for 20 minutes, lift 30 pounds, climb two flights of stairs, bathe, dress and drive (*Id.*). Dr. Osei observed that Mr. Wheatley had no difficulty getting up from a sitting position, or getting on to and off of the examination table (R. 746). Mr. Wheatley had limited ROM due to pain in his cervical spine, lumbar spine and shoulder joints, but otherwise normal ROM (R. 747-48). He had no tenderness in his lumbar spine and lower extremity, and 5/5 strength (R. 747). His upper extremity and grip strength was 4/5 (*Id.*). In addition, Mr. Wheatley could walk greater than 50 feet without support,

6

and his gait was not ataxic (that is, not characterized by abnormal, uncoordinated movements) (*Id.*).

On August 4, 2010, Henry Rohs, M.D., completed a physical RFC assessment for DDS. Dr. Rohs found that Mr. Wheatley could perform light work, but with only occasional climbing of ladder/rope/scaffolds and limited ability to push and/or pull in his upper extremities and limited reaching in all directions (R. 751-53). This RFC was affirmed on review by another DDS physician on October 27, 2010 (R. 759-60).

On October 12, 2010, Mr. Wheatley reported no changes in his daily activities since his last disability report (R. 511-12). He wrote: "On good days I can do pretty much everything to take care of myself. But on bad days sometimes it can take up to a week before I can get off the couch to care for myself" (R. 508). On December 27, 2010, he wrote that he could not stand or sit as long due to worsening pain and his ability to lift had decreased (R. 520).

During approximately the next six months, from January or February 2011 through June or July 2011, Mr. Wheatley worked at Bass Pro Shops as a sales associate (R. 528, 535). On June 13, 2011, Mr. Wheatley returned to Dr. Salman, complaining of an exacerbation of his low back pain, radiating into his left buttock and thigh (R. 789). On June 21, July 12, and July 19, 2011, Dr. Salman performed prognostic medial branch nerve blocks on the left side at L3 through L5, which each provided Mr. Wheatley with 6 to 12 hours of 80 to 100 percent relief of his left low back pain (R. 789-90, 792, 794). On August 2, 2011, Dr. Salman performed radiofrequency ablation of the left L3 through L5 medial branch nerves (R. 796).

On August 26, 2011, Mr. Wheatley returned to Hinsdale Orthopaedics. Dr. Christopher DeWald reviewed Mr. Wheatley's old MRIs, and opined that he had multiple level disc disease without acute herniation (R. 843). Mr. Wheatley complained of constant, sharp low back pain

extending to his left leg, causing numbness and weakness, which worsened when sitting or bending over. He stated that he could walk about 1/4 mile, stand for half an hour and sit for ten minutes (*Id.*). The medical report further noted that "[h]e does not take any medication" (*Id.*). Mr. Wheatley could bend forward about 30 to 40 degrees with increased pain, and his extension was 10 degrees, but he had good ROM in his hips and knees and excellent ROM in his back (*Id.*). Dr. DeWald ordered a new MRI, which Dr. DeWald (through his nurse) stated showed mild to moderate disc degeneration but "nothing new" (R. 762-63, 837). Dr. DeWald noted that multi-level fusion may be the only option, but he was unsure of going forward with this procedure on such a young man (R. 844, 837). Mr. Wheatley was also hesitant to treat his pain surgically, and Dr. DeWald was supportive of his plan to treat with injections and radiofrequency ablation (R. 838).

In December 2011, Mr. Wheatley returned to Dr. Salman, reporting improved, though residual left lower back pain and tenderness, and significant pain in his right lower back, and on December 20, 2011, Mr. Wheatley had a left sacroiliac joint steroid injection (R. 807). On December 27, 2011, January 3, 2012, and 17, 2012, Dr. Salman performed prognostic medial branch nerve blocks on the right side at L3 through L5 (R. 808, 810, 812, 814). After Mr. Wheatley reported that these provided him with at least six hours of low back pain relief, on January 24, 2012, Dr. Salman performed radiofrequency ablation of Mr. Wheatley's medial branch nerves on the right side at L3 through L5. The ablation slowly improved his right sided low back pain, but caused some pain and numbness in his bilateral lower extremities (R. 827).

On February 7, 2012, Mr. Wheatley underwent a lumbar L4-5 epidural steroid injection (R. 818). This provided about 10 percent improvement of his low back pain; he still experienced pain at a level of 4 out of 10 in the left lower back region, which was aggravated when sitting

and going from sitting to standing (R. 827). Mr. Wheatley took Skelaxin (muscle relaxant/pain reliever) as needed, Vicodin (sparingly because it caused significant drowsiness and nausea), and Celebrex (occasionally) with minimal improvement (*Id.*). Mr. Wheatley's lumbar spine was tender to palpation, with significant tenderness of the left sacroiliac joint, but his strength was 5/5 (*Id.*). Dr. Salman prescribed a trial of Cymbalta (R. 828), and on February 28, 2012, performed left S1 through S3 sacral lateral branch nerve blocks for Mr. Wheatley's chronic low back pain (R. 853).

### III.

Mr. Wheatley, his wife, and a vocational expert ("VE") testified at a one-hour hearing before the ALJ on February 14, 2012. Mr. Wheatley testified from a kneeling position because he said sitting or standing too long was painful (R. 102). However, he testified that he went on an eight-hour driving trip to Arkansas in 2010; he helped his wife drive, but mostly he sat reclining in the car (R. 103).

Mr. Wheatley testified that after the February 2008 car accident, he went back to work light duty until July 2008, when he stopped work because something happened to his back (R. 104). Despite back problems, he later went back to work as a boat salesperson because he loved to work and he could come and go and stand or sit as he pleased (he stood most of the time) (R. 104, 121). However, he stopped working after 6 months because his pain worsened and he could not walk anymore (R. 104-05, 120).

Mr. Wheatley stated that on a good day, his pain was at a level of about 3 out of 10 (R. 114). On those days, he could dress himself, walk the dog for about five minutes, make his own food and do five minutes of light housework, such as cleaning dishes, vacuuming, or dusting (R. 114-15). He drove about once a week (R. 105-06). He could carry weight on the side of his body,

such as about five pounds of groceries, but laundry required too much bending and weight bearing in front (R. 115). Sometimes Mr. Wheatley mowed the lawn for ten minutes, but afterward, he had to lay back on the recliner (R. 118).

He has bad days one to five times per week, where he mostly stays on the recliner and cannot do anything for himself (R. 113-16). On those days, he has constant lower back pain shooting down his buttocks and legs, which become numb and tingly (R. 119). On those days, he sleeps in shorts or sweats so he does not need to pull on clothing in the morning, and his wife gives him showers because he cannot bend over (R. 117-18). His wife confirmed that she helps him put on socks and pants and has helped him shower a couple of times, and that Mr. Wheatley has spent almost two weeks on the couch in pain (R. 127-29). Mr. Wheatley also testified that he has trouble sleeping at night because he is uncomfortable and he gets an upset stomach from the Naproxen he takes for pain, so he naps on the couch a couple times per week for about 30 to 60 minutes (R. 107-08). Vicodin makes him lethargic (R. 108-09).

The VE testified next. The ALJ first asked the VE to assume an individual of Mr. Wheatley's age, education and work experience, with an RFC to do light work, occasionally climb ladders, ropes or scaffolds, and frequently reach in all directions, including overhead, with both upper extremities (R. 131). The VE testified that individual could do Mr. Wheatley's past relevant work in boat sales and other work (R. 131-32). The ALJ then limited the individual to frequently climb ramps and stairs but never ladders, ropes or scaffolds, occasionally balance and stoop, never kneel, crouch or crawl, only occasionally reach overhead with both upper extremities, and frequently handle and finger with the upper extremities (R. 132). The VE testified that individual could do the same jobs as in the first hypothetical (R. 132-33). In the third hypothetical, the ALJ limited the individual to sedentary work (R. 133). The VE testified

that there were sedentary jobs available, but if the individual needed to change position from sitting to standing or walking on an hourly basis for 5 minutes each, that would preclude jobs unless the person remained on task, which may or may not be possible to do while leaning on a chair (R. 134-36). No work was available for an individual who needed to sit or rest in reclining fashion for 2 to 4 hours per day (R. 134-35).

At the hearing, Mr. Wheatley's attorney said that he hoped to obtain an RFC opinion from Dr. Salman, and the ALJ left the record open for it (R. 98). On March 13, 2012, Dr. Salman noted that Mr. Wheatley gave him paperwork about his pursuit of disability benefits (R. 822). Dr. Salman wrote that he advised Mr. Wheatley to pursue a functional capacity evaluation after he completed treatment for his sacroiliac joint pain, most likely via radiofrequency ablation (*Id.*). That same day, Dr. Salman performed sacral lateral branch nerve blocks on Mr. Wheatley's left side at S1, S2, and S3, and on March 20, 2012, he performed left S1 through S3 radiofrequency ablation of the sacral lateral branch nerves (R. 823, 832). However, Dr. Salman never performed an RFC evaluation of Mr. Wheatley.

## IV.

The ALJ issued her first opinion in this case on April 2, 2012. The ALJ found Mr. Wheatley was not disabled from his alleged onset date of February 18, 2008, until December 31, 2010, which the ALJ stated was the date last insured (R. 147). At Step 1, the ALJ found that Mr. Wheatley had not engaged in substantial gainful activity during this time (R. 149). At Step 2, the ALJ determined that Mr. Wheatley had the following severe impairments: degenerative disc disease of the lumbar spine, cervical spine and shoulders (*Id.*). However, at Step 3, the ALJ stated that Mr. Wheatley's impairments, alone or in combination, do not meet or equal a Listing, particularly Listings 1.02 and 1.04 (R. 150).

11

The ALJ stated that through December 31, 2010, Mr. Wheatley had the RFC to perform light work except that he could only occasionally climb ladders, ropes or scaffolds, and was limited to frequent reaching bilaterally in all directions including overhead (R. 150). The ALJ stated that light work accounted for Mr. Wheatley's degenerative disc disease in his lumbar and cervical spine, and that occasional climbing and frequent reaching accounted for degenerative joint disease in his shoulders (R. 154).

The ALJ concluded that Mr. Wheatley's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his "statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 151). The ALJ noted that none of Mr. Wheatley's treating sources had provided an opinion regarding his ability to work (R. 155). She also stated that his level of complaints was not supported by objective findings in the MRIs, hospital records from August 2008, records of Dr. Salman's injections, blocks, and ablations of different nerves from November 2008 through March 2012, Dr. Osei's July 24, 2010 findings, and Dr. Rohs' August 4, 2010 physical RFC assessment (R. 151-54).

The ALJ found that the objective evidence did not support Mr. Wheatley's level of subjective complaints for several reasons. On examination, Mr. Wheatley had no point tenderness, could flex forward 90 degrees without an increase in back pain, and had negative leg raising and full strength in his lower extremities (R. 153-55). In addition, the ALJ stated that the MRI of Mr. Wheatley's lumbar spine and the treatment Mr. Wheatley received -- with "no indication that any of the claimant's treating physicians recommended more invasive treatment" -- did not support his allegations of disabling pain (R. 154-55). The ALJ also questioned Mr. and Mrs. Wheatley's testimony that he needed his wife's help to get dressed because imaging did not

12

indicate that Mr. Wheatley's shoulder condition worsened since he reported in a May 31, 2010 function report that he had no difficulty dressing, bathing or caring for his personal needs (R. 155). Moreover, the ALJ found their testimony that Mr. Wheatley could only sit for fifteen minutes at one time was inconsistent with the fact that he went on an eight-hour driving trip to Arkansas in 2010, driving part of the way and sitting reclined the other part (*Id.*).

At Step 4, the ALJ found that Mr. Wheatley could not perform his past relevant work as a construction supervisor (R. 155). Nevertheless, at Step 5, the ALJ stated that jobs existed in significant numbers in the national economy that Mr. Wheatley could perform, and thus, that he was not under disability at any time from February 18, 2008, the alleged onset date, through December 31, 2010 (R. 156).

## V.

On March 11, 2013, the Appeals Council ruled that the ALJ erred in determining Mr. Wheatley's date last insured (R. 163). The Appeals Council found that the date last insured was December 31, 2011, not December 31, 2010, and remanded the case to the ALJ for consideration of the evidence from January 1, 2011, to December 31, 2011 (R. 163-64). Prior to the second hearing on June 7, 2013, Mr. Wheatley had one follow-up visit with Dr. Templin, and continued treatment with Dr. Salman.

At Mr. Wheatley's appointment on December 20, 2012, Dr. Templin noted that Mr. Wheatley reported severe pain (a level of 6 to 9 out of 10) across 90 percent of his back and going into his legs, with occasional numbness (R. 847). Mr. Wheatley stated that his pain was aggravated with exercise, prolonged sitting, standing, walking, bending, pushing, and pulling, and reduced by reclining in a chair (*Id.*).

Between May 2012 and June 2013, Dr. Salman performed the following procedures: (1) ablation of left side lumbar L3 through L5 nerves (R. 858); (2) left sacroiliac joint injection (R. 861); (3) ablation of right side lumbar L3 through L5 nerves (R. 864); (4) ablation of left side S1 through S3 sacral lateral branch nerves (R. 831); (5) trigger point injections in lower lumbar parasinal region (R. 829-30); and (6) an L4-L5 epidural steroid injection (R. 841). These procedures provided Mr. Wheatley with pain relief in his upper and lower back, but the relief was temporary. He continued to experience low back pain and tenderness, with some radiating pain and numbness into his buttocks and lower extremities, aggravated with prolonged sitting and driving and going from sitting to standing (R. 830, 842, 860, 863).[3] However, Mr. Wheatley consistently walked with a non-antalgic gait (R. 829).

Mr. Wheatley continued to take Aleve daily for pain, because he could not tolerate the other pain medications he had tried, including hydrocodone, Lyrica, Cymbalta, Vimovo, and Flexeril, which caused excessive sedation and/or cognitive dysfunction (R. 863). He also took Skelaxin, Mobic (for arthritis pain) and Vicodin occasionally (R. 839, 842). Mr. Wheatley tried acupuncture and chiropractor therapy, as well as a TENS (transcutaneous electrical nerve stimulation) unit and a back brace; these provided some, temporary improvement (R. 839). Mr. Wheatley remained hesitant about undergoing lumbar disc surgery (R. 829).

## VI.

On June 7, 2013, the ALJ conducted a second hearing, at which Mr. Wheatley, a medical expert ("ME"), and a VE testified. At the hour-long hearing, Mr. Wheatley shifted once from a sitting to kneeling position (R. 53).

---

[3]In January and February 2013, Dr. Salman noted that Mr. Wheatley had positive trigger points on each side of his lower lumbar spine (R. 829-30).

The ALJ focused on the period January 1, 2011 through December 31, 2011 (R. 37). At that time, Mr. Wheatley worked three to five days per week, four to eight hours per day, selling boats at a Bass Pro Shops, 20 miles away from his home (R. 45, 51). The number of days and hours he worked depended on "what they needed;" if people did not show up to work, his employer might have asked him to stay longer (R. 51). He testified that his pain at the time was at a level of about 3 out of 10, but after four to six months of work, his leg and back pain became too severe to work (R. 46, 63). Mr. Wheatley recalled that he took one or two driving trips to Arkansas to visit his wife's family in 2010 or 2011, and that he was sore after his trip to Arkansas (R. 50, 57-58).

Mr. Wheatley recalled that during 2011, he helped cook (standing about 15 minutes), clean, walk the dog, mow the lawn, and load the washing machine (R. 48, 58-59, 66). He also stretched one to two hours each day and exercised in the swimming pool (R. 60-61, 73). He drove about 4 miles once a week to visit his parents (R. 50). Mr. Wheatley testified that his pain ranged from a level of 3 out of 10 to 8 out of 10 by the end of the day (R. 60). He could walk 30 to 45 minutes, but then had to sit in a recliner for 1 to 2 hours (R. 53-54). He could only sit up straight for five to ten minutes before it really started to hurt (R. 68), and shifting from sitting to standing was also very painful (R. 70). He went downstairs typically just once daily and slept on the couch (R. 48-49).

The ME, Sheldon Slodki, testified next. He noted that this was "primarily a pain case," with severe low back and neck pain and elements of fibromyalgia (R. 75). Mr. Wheatley had "frequent" and "significant" pain treatment from Dr. Salman for a long period of time (R. 77). However, as of September 12, 2011, Mr. Wheatley's MRI showed no significant changes, and he had no motor loss and thus did not meet Listing 1.04 (*Id.*). Dr. Slodki did "not disagree" with Dr.

Rohs' August 4, 2010 RFC assessment, which represented a "marked reduction" -- light work with postural and manipulative limitations -- in physical capacity (R. 77-78).

The VE then testified that there were jobs available for an individual who could perform light work, frequently climb ramps and stairs, never ladders, ropes or scaffolds, occasionally balance and stoop, kneel, crouch, and crawl, and frequently reach in all directions, including overhead, with both upper extremities (R. 85-87). There was also sedentary work available; however, if the individual needed to change position from sitting to standing or walking approximately 30 minutes at a time, it would prevent sedentary work, which generally requires remaining at one's desk (R. 87-88). Alternating sitting and standing was okay if the person could remain on-task, but they would be off-task if they had to walk away from their job site because unskilled or low semi-skilled workers are expected to be on-task outside of normal breaks (two 10 to 20 minute breaks and one 30 minute mid-shift break) (R. 89). In addition, the VE stated that allowing a person to kneel during the workday would need special accommodation and likely would not be tolerated, particularly in unskilled jobs (*Id.*).

## VII.

In the June 28, 2013 written opinion, the ALJ found that from February 18, 2008, through December 31, 2011, the date last insured, Mr. Wheatley was not under a disability within the meaning of the Act (R. 17). The ALJ stated that she would only address the period specified by the Appeals Council: January 1, 2011, to December 31, 2011 (*Id.*).

At Step 1, the ALJ found that Mr. Wheatley had engaged in substantial gainful activity from January 1, 2011 through December 31, 2011 (R. 19). However, the ALJ went on to state that the $12,763.36 Mr. Wheatley earned in 2011 was "almost substantial gainful activity level,"

and because it was "so close," she considered additional evidence through Step 5 instead of finding Mr. Wheatley not disabled at Step 1 (*Id.*).

At Step 2, the ALJ found that Mr. Wheatley had the following severe impairments: degenerative disc disease of the lumbar and cervical spine and fibromyalgia (R. 20). At Step 3, however, the ALJ found that the impairments alone or in combination did not meet or equal any listing, paying particular attention to 1.04 (disorders of the spine) (*Id.*). The ALJ determined that Mr. Wheatley had the RFC to do light work except that he can frequently climb ramps and stairs, but never ladder, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; and frequently reach in all directions, including overhead with both upper extremities, with some environmental limitations (*Id.*).

The ALJ reviewed the objective medical evidence beginning January 1, 2011, including: (1) multiple treatments with Dr. Salman from June 13 through December 27, 2011, and from January through March 2012; (2) an MRI from August 29, 2011 that was overall unchanged from the previous MRI except with some additional mild degeneration at L4-5; and (3) reports from Dr. DeWald in August, September and December 2011 noting that multilevel fusion might be the only remaining option to address Mr. Wheatley's complaints of pain (R. 22-24). The ALJ stated that she did not credit Mr. Wheatley's testimony because Mr. Wheatley's complaints concerning the intensity, persistence and limiting effects of his symptoms, as they were out of proportion to "the minimal medical evidence" and objective findings (R. 24-25). The ALJ stated that Mr. Wheatley's examinations were "essentially normal" because, despite alleged numbness and weakness in his left lower extremity and some decreased range of motion in his lumbar spine, examinations consistently showed intact sensation and 5/5 strength in his legs with no point tenderness or tenderness to palpation (R. 25). The ALJ also found that diagnostic tests did

not support Mr. Wheatley's complaints because MRIs showed no significant disc herniation or nerve root compression (*Id.*).

The ALJ also found that Mr. Wheatley's complaints of severe pain were not supported by his pain treatment (R. 24). Relying on an August 2011 report from Dr. DeWald stating that Mr. Wheatley was not taking any medications, the ALJ stated that the medical records showed he was taking no pain medication for most of 2011, and when he used medication, it was Naproxen rather than narcotic-based pain relievers (R. 25). The ALJ also described Mr. Wheatley's treatment with injections and nerve ablation as "conservative" (R. 23, 25).

In addition, the ALJ stated that Mr. Wheatley's "fairly intact" activities of daily living ("ADLs") suggested that he had greater ability than he acknowledged (R. 24). "[M]ost notably," the ALJ stated that Mr. Wheatley worked during the period at issue at substantial gainful activity levels (*Id.*). Moreover, in 2011 he swam and exercised daily, walked the dog, prepared meals, dusted, did dishes and laundry, mowed the lawn with a self-propelled mower, and fished once or twice a month (R. 25). Finally, although Mr. Wheatley alleged that he could only sit for 10 minutes at a time, the ALJ noted that in 2011, he drove to Arkansas once or twice to visit family, and he commuted to work 20 miles away from his home three to five days a week (*Id.*).

The ALJ gave great weight to the State Agency medical opinions, and found that the overall evidence supported Dr. Slodki's testimony, who did not disagree with Dr. Rohs' assessment, which accounted for a "marked reduction" in Mr. Wheatley's physical capacity (R. 25-26). Ultimately, the ALJ agreed with the VE that Mr. Wheatley could not do past relevant work as a construction supervisor/carpenter at Step 4, but could do other jobs at Step 5 (R. 26).

## VIII.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence," *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Plaintiff's sole challenge centers on the ALJ's determination of the credibility of Mr. Wheatley's allegations of pain (doc. # 14: Pl.'s Mem. at 6). The legal standard for review of an ALJ's credibility determination is well-settled in the Seventh Circuit. We give deference to the ALJ's credibility decision "[b]ecause the ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . ." *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotations and citations omitted). "So long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). Courts "should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Mr. Wheatley addresses six factors that the ALJ cited to support her decision that Mr. Wheatley's allegations of disability were not credible: (1) Mr. Wheatley's 2011 return to work, (2) his ADLs, (3) his "conservative" treatment (including no narcotic pain medication), (4) his inconsistent statements, (5) the lack of a treating doctor RFC opinion, and (6) the lack of

objective medical evidence to support his impairment (Pl.'s Mem. at 7).[4] Mr. Wheatley does not dispute that under the Social Security Regulations, these factors are relevant for an ALJ to consider in evaluating a claimant's testimony about symptoms such as pain.[5] However, Mr. Wheatley argues that the ALJ's analysis of these factors was patently wrong because it was "based on factual errors, legally insufficient analysis, and improper inferences . . ." (*Id.* at 6). For the reasons that follow, while we agree that the ALJ's credibility analysis was not flawless, we nevertheless find that the ALJ's determination was not "patently wrong."

## A.

We begin with the ALJ's consideration of Mr. Wheatley's return to work in 2011 as evidence that he could work a full-time job. The ALJ stated that "most notably, the claimant worked during the period at issue (calendar year 2011) at substantial gainful activity level and thus it would appear he could do work" (R. 24).[6] The ALJ's discussion of Mr. Wheatley's 2011 work was brief. She acknowledged that the job lasted less than nine months and discussed Mr. Wheatley's earnings during the first three quarters of 2011 (R. 19). The ALJ also noted that Mr.

---

[4]Mr. Wheatley also briefly argues that the ALJ's analysis of the testimony of Mr. Wheatley's wife was improper and illogical, because the ALJ discredited her testimony "for the same reasons" she found Mr. Wheatley's testimony not credible (Pl.'s Mem. at 14-15). We disagree with plaintiff. Mrs. Wheatley's testimony consisted primarily of her observations of her husband's functional abilities and daily activities, and the ALJ could provide the same reasons for finding Mrs. Wheatley's testimony on those points not credible as she applied to Mr. Wheatley's testimony.

[5]The regulations state that the ALJ shall consider: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, the claimant has received for relief of pain or other symptoms; whether there are any inconsistencies in the evidence or conflicts between the claimant's statements as to his or her symptoms and the rest of the evidence; and whether the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c).

[6]The Social Security Regulations state that if a claimant is working and the work is substantial gainful activity, then the claimant is not disabled regardless of his or her medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(b). The regulations define substantial gainful activity as paid work activity that involves doing significant physical or mental activities, "even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.* at §§ 404.1572 (a-b). Despite opining that Mr. Wheatley's six months of work constituted "substantial gainful activity," the ALJ declined to find Mr. Wheatley disabled on this ground, and continued through the Act's five-step disability analysis.

20

Wheatley's 2011 job required him to commute 20 miles to and from his home, three to five days a week (R. 25). The ALJ did not discuss Mr. Wheatley's testimony that the job allowed him to come and go as he pleased -- or, that he worked more or less hours depending on his employer's needs.

Mr. Wheatley does not dispute that the ALJ was entitled to consider his work history in determining his credibility (Pl.'s Reply at 1). In *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit affirmed a finding that the claimant was not disabled where, among other things, the ALJ found that the claimant's part-time work as a carpenter was inconsistent with his claimed limitations from his back pain. Mr. Wheatley points out that in *Berger*, unlike in his case, the claimant continued to work as a carpenter, whereas Mr. Wheatley had to stop work after six months (Pl.'s Reply at 2). However, the analysis is similar. In *Berger*, "the diminished number of hours per week" that the claimant worked as a carpenter showed that he was not at his best, but the fact that "he could perform some work cut[] against his claim that he was totally disabled" during the time period at issue. *Berger*, 516 F.3d at 546.

Mr. Wheatley contends that the ALJ mischaracterized or misunderstood his 2011 work, and ignored that the work ended after no more than six months due to his worsening pain, was less than full-time, and that his employer accommodated his need to come and go as he pleased (Pl.'s Mem. at 7-8; doc. # 23: Pl.'s Reply at 1-2). Rather than show that he could handle a full-time job, Mr. Wheatley argues that his 2011 work shows that he could not even handle a part-time job because he had to quit after six months due to the pain (Pl.'s Reply at 2).

Although the ALJ did not discuss the come-and-go nature of Mr. Wheatley's 2011 job, the ALJ did note the part-time and abbreviated nature of Mr. Wheatley's work. The ALJ, however, chose to focus on the months (albeit less than 12) when Mr. Wheatley commuted long

21

distances multiple days per week to work. The ALJ found that this undermined Mr. Wheatley's testimony that he could not work before his date last insured; Mr. Wheatley comes to a different conclusion as to the import of his 2011 job. However, Mr. Wheatley's offer of a different interpretation as to the meaning of his 2011 work does not make the ALJ's contrary determination patently wrong.

## B.

We next address together the ALJ's consideration of Mr. Wheatley's ADLs and inconsistent statements in finding Mr. Wheatley's allegations not credible. Mr. Wheatley argues that in determining that his "activities of daily living are inconsistent with complaints to doctors and suggest greater ability," the ALJ mischaracterized his daily activities and failed to recognize that the activities Mr. Wheatley did perform exacerbated his pain and were not consistent with the ability to work full-time (Pl.'s Mem. at 8-9, citing R. 24). The ALJ described Mr. Wheatley's activities during the relevant period as: swimming, exercising, walking the dog, preparing meals, dusting, doing dishes, doing laundry, going grocery shopping, mowing the lawn with a self-propelled mower, and fishing once or twice a month (R. 24). By contrast, Mr. Wheatley states that he did not swim, but rather did stretching exercises in the pool, and while he pushed himself to do chores around the house, he did so for only short periods of time and needed to rest in between chores due to the pain (Pl.'s Mem. at 8-9). In addition, the ALJ noted that Mr. Wheatley took one or two driving trips to Arkansas during the relevant period despite claiming that he could only sit for 10 minutes at a time (R. 25).[7]

"[W]orking sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015). However, the amount of daily activities performed and the level of exertion necessary

---

[7]Mr. Wheatley testified that he took one or two driving trips to Arkansas, either in 2010 or 2011 (R. 50).

to engage in those activities "are exactly the type of factors the ALJ [i]s required to consider" in determining a claimant's credibility. *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013). In *Pepper*, the ALJ found the claimant's testimony that that she could not sit, stand or concentrate for an extended period of time was undermined because it was "in direct contrast" to her assertions that she engaged in numerous daily activities that involved focused thinking and physical activity, such as driving 40 minutes to see her mom, shopping, and preparing meals. *Id.* at 368. The Seventh Circuit determined that the ALJ's adverse credibility determination was not "patently wrong" because "[t]he ALJ's explanation was sufficient to reasonably conclude that [the claimant] exaggerated the effects of her impairments." *Id.* at 369. Here, as in *Pepper*, the ALJ found that Mr. Wheatley's activities of daily living and long driving trips were inconsistent with his claims that severe back and neck pain allowed him to only sit and stand for very short periods of time. The ALJ here misconstrued Mr. Wheatley's ability to "swim" daily, but this does not undermine the ALJ's analysis of Mr. Wheatley's numerous other activities of daily living.

Mr. Wheatley argues that contrary to the ALJ's finding, his daily activities were consistent with his claims that he could only sit and stand for very short periods (Pl.'s Br. at 9). In *Engstrand*, the Seventh Circuit found the ALJ's adverse credibility finding patently wrong because the claimant's reported activities, including helping with seated tasks at his parents' farm and driving, were "quite consistent" with the claimant's testimony that he could not stand for very long without pain and needed to frequently alternate between sitting, standing, and lying down. *Engstrand*, 788 F.3d at 662. Mr. Wheatley contends that he performs only "a few limited chores" in "abbreviated times spans, limited by pain, and punctuated by periods of rest," and that "[a]t least three days per week he cannot do anything but sit in his recliner with heat or ice

packs" (Pl.'s Br. at 9). However, Mr. Wheatley's description overstates the limitations on his daily activities that he testified to at the hearing and disclosed in his function reports to DDS. In addition, to the extent that Mr. Wheatley did testify to such extreme limitations (during the first hearing, Mr. Wheatley claimed he was "pretty much stuck on the couch" three to five days per week), we do not find that the ALJ was patently wrong in concluding that she "didn't believe that the pain was severe enough to disable h[im] to the extent []he claimed." *Mitze v. Colvin*, 782 F.3d 879, 881 (7th Cir. 2015).

Mr. Wheatley argues that his ADLs were not inconsistent with his complaints of disabling pain because his condition was worsening, and he had better days and worse days (Pl.'s Mem. at 12; Pl.'s Reply at 7). Some days he could perform the chores he described, but other days he could not (*Id.*). However, the ALJ reviewed Mr. Wheatley's testimony of his good days and bad days, and did not find credible Mr. Wheatley's testimony that his pain was disabling.

Mr. Wheatley also contends that the ALJ erred in finding that his road trip to Arkansas was inconsistent with his testimony that he can only sit up straight for ten minutes (Pl.'s Br. at 9). We disagree. Despite being "sore" after the trip and allegedly spending most of his time reclined in the passenger seat with his feet elevated on cup holders (Pl.'s Br. at 9), "a person with disabling pain would be likely to find extremely uncomfortable . . . traveling" long distances in the car. *Mitze*, 782 F.3d at 882. The ALJ could reasonably conclude that such long-distance travel, together with the daily activities Mr. Wheatley performed, was inconsistent with having pain severe enough to preclude full-time employment. *See id.* (holding that the ALJ had reason to doubt that the plaintiff's pain symptoms were totally disabling because she ran for an hour daily and flew to and from Australia); *see also Berger*, 516 F.3d at 546 (upholding the ALJ's adverse credibility determination regarding the claimant's claims of disabling back pain where

he performed household chores, went fishing, and drove long distances to see his girlfriend). Even if Mr. Wheatley is correct that it was "reasonable to assume" that the road trips were not inconsistent with his testimony because he needed to recline and elevate his feet (Pl.'s Reply at 7), Mr. Wheatley does not show that the ALJ's interpretation of the road trips as inconsistent with his testimony was unreasonable, or patently wrong.

## C.

Next, Mr. Wheatley contends that the ALJ misunderstood or mischaracterized the extensive nature of Mr. Wheatley's pain management treatment and erred in finding that it was inconsistent with his claims of disabling pain (Pl.'s Br. at 10). The ALJ noted that Mr. Wheatley did not receive treatment from Dr. Salman between August 2009 and June 2011 (despite, we note, an alleged onset date of February 18, 2008), although he took Aleve, which provided some pain relief (R. 22-23). And, beginning on June 13, 2011, Mr. Wheatley began again receiving repeated steroid injections, nerve blocks and radiofrequency ablation in his spine (*Id.*). Despite this evidence, the ALJ stated that Mr. Wheatley did not take any pain medication for the majority of 2011, and that the medication he took was limited to Naproxen without "any narcotic based pain relieving medication in spite of his allegations of quite limiting pain" (R. 25). The ALJ also described Mr. Wheatley's pain management treatment with injections and nerve ablation as "conservative" (*Id.*).[8]

We agree that the ALJ erred in drawing an adverse inference from Mr. Wheatley's failure to take narcotic pain medication without first discussing his explanations for not taking it (Pl.'s

---

[8] Plaintiff notes that the ALJ found "no indication that any of the claimant's treating physicians recommended more invasive treatment" for his back and shoulder pain (R. 155), but then plaintiff argues that the ALJ "insinuate[ed]" that Mr. Wheatley's failure to pursue surgery undermined his claims of disabling pain (Pl.'s Br. at 10). Indeed, in August 2011 Dr. DeWald's office did note that surgery might be the only option for Mr. Wheatley; however, as plaintiff points out, Dr. DeWald opined that such surgery might be inappropriate for an individual of Mr. Wheatley's age (*Id.*). We do not agree that the ALJ used or misused this evidence in any way to further undermine Mr. Wheatley's credibility (*Id.*).

Mem. at 11). *See Hill v. Colvin*, 807 F.3d 862 (7th Cir. 2015). Here, as in *Engstrand*, Mr. Wheatley explained that he did not take certain medications because he could not tolerate them. *Engstrand*, 788 F.3d at 657. In addition, the ALJ's broad statement that Mr. Wheatley did not take pain medication for the majority of 2011 does not account for the six months of injections and ablations he received in 2011, or Mr. Wheatley's testimony -- despite the brief note to the contrary by Dr. DeWald in August 2011 -- that he continued to take Aleve as needed for pain. However, these errors do not undermine the ALJ's analysis of Mr. Wheatley's treatment as a whole, which took into consideration Mr. Wheatley's treatment with Dr. Salman and use of Aleve, despite omitting his intolerance to narcotic pain medication.

In addition, while the ALJ's description of Mr. Wheatley's treatment with Dr. Salman as conservative might be "a bit harsh," we will not overturn the ALJ's credibility finding because there is "some support in the record." *Berger*, 516 F.3d at 546. Mr. Wheatley points out that Dr. Slodki, the ME, described his treatment with Dr. Salman as "significant" and "extensive" (Pl.'s Br. at 11). However, the fact that treatment is frequent and significant does not automatically mean that it is not "conservative" -- at least in the sense that it is not invasive. For example, Mr. Wheatley's physical therapy treatment could also be considered extensive and significant, but plaintiff does not suggest that physical therapy was more than conservative treatment. Indeed, the Seventh Circuit has specifically declined to rule that an ALJ's characterization of treatment with epidural steroid injections as "conservative" was erroneous, and we will not do so here. *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (upholding the ALJ's finding that the claimant's treatment with pain medications and several injections was "relatively conservative," given the deference we show to

26

an ALJ's factual determinations and in comparison to treatment with morphine and a surgical spinal implant).[9]

Moreover, plaintiff contends that the ALJ ignored the fact that he repeatedly pursued pain relief, but that the treatment was not effective and his pain continued (Pl.'s Reply at 4). The fact that Mr. Wheatley sought treatment supports his position that he experienced pain. However, it does not establish that the ALJ committed a patent error by doubting Mr. Wheatley's assertions that the pain was severe enough to disable him. *See Mitze*, 782 F.3d at 881.

### D.

Mr. Wheatley also contends that the ALJ erred in drawing an adverse credibility inference due to the absence of an RFC opinion from Dr. Salman, because Dr. Salman was simply a "cautious man" who did not want to provide an opinion until Mr. Wheatley was "physically capable of undergoing a functional capacity evaluation" (Pl.'s Mem. at 13; Pl.'s Reply at 6). This misstates the record. At the first hearing, on February 14, 2012, Mr. Wheatley's attorney represented that he was seeking an RFC opinion from Dr. Salman, and the ALJ left the record open to receive it (R. 98). On March 13, 2012, a note from Dr. Salman states that he advised Mr. Wheatley to pursue a functional capacity evaluation after he completed treatment for his sacroiliac joint pain, most likely via radiofrequency ablation (R. 822), which treatment was performed one week later (R. 823, 832). However, despite gaining an extra year in which to obtain an RFC opinion after the Appeals Council remanded his case, Mr. Wheatley never obtained from Dr. Salman an RFC evaluation. There is no evidence that Dr. Salman refused to

---

[9]Mr. Wheatley also argues that radiofrequency ablation "destroys" the nerve and is thus more invasive than injections (Pl.'s Br. at 10-11). Mr. Wheatley relies on the ME's testimony that ablation can destroy or temporarily disable the nerve (*Id.*, citing R. 79). However, without any medical evidence that radiofrequency ablation destroyed or otherwise permanently altered Mr. Wheatley's nerves (as opposed to temporarily disabling the nerve), and given the deference we accord the ALJ's factual determinations, we decline to find error in the ALJ's characterization of Mr. Wheatley's treatment as conservative. *See Simila*, 573 F.3d at 519.

provide an evaluation during that time because he was cautious, or because Mr. Wheatley simply declined to pursue it.

Mr. Wheatley admits that the absence of a treating doctor's opinion on a claimant's ability or inability to work "can be enlightening" (Pl.'s Mem. at 13, citing *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010) (affirming denial of disability benefits where the ALJ had found it "illuminating and persuasive on its face that none of [the claimant's] doctors opined that she was unable to work."). *See also Williams-Overstreet v. Astrue*, 364 F. App'x 271, 276 (7th Cir. 2010) (holding that there was adequate support for the ALJ's credibility determination, including that no physician had opined that the claimant was totally disabled). Indeed, even where the treating physician noted the claimant's reports of persistent, chronic and severe pain, but failed to explain how the pain limited the claimant's activities, the ALJ was entitled to find that the claimant was capable of full-time employment and therefore not totally disabled. *Mitze*, 782 F.3d at 882. We find that the ALJ reasonably used the absence of a treating physician RFC opinion to support the adverse credibility finding in this case.

Moreover, while the ALJ did not have an RFC opinion from Mr. Wheatley's treating physician, she did have an RFC opinion from a DDS physician as well as from the ME. Dr. Rohs opined that Mr. Wheatley could perform a limited variation of light work, and Dr. Slodki, who observed Mr. Wheatley at the hearing, did not disagree with Dr. Rohs' opinion (R. 77). The ALJ was entitled to rely on these opinions as further support for her adverse credibility finding (R. 25-26).

### E.

Finally, plaintiff contends that the ALJ erred in relying on her conclusion that the objective medical evidence did not substantiate Mr. Wheatley's allegations (Pl.'s Mem. at 13).

The ALJ wrote that she could not base her finding of disability solely on the claimant's subjective complaints and testimony (R. 24). This misstates the law. The rule is that the ALJ may not reject a claimant's statements about the intensity and persistence of his pain or other symptoms solely because the objective medical evidence does not substantiate the statements. 20 C.F.R. at § 404.1529(c)(2). Indeed, the Seventh Circuit has repeatedly admonished that ALJs may not discount a claimant's credibility solely because his pain testimony is not discernible by physical and diagnostic tests, because pain can be disabling even though no physical cause could be identified. *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015).

However, the ALJ's misstep on this point does not require a remand here because the ALJ did not base her decision solely on the lack of objective medical evidence, as our analysis above demonstrates. "[T]he lack of objective support from physical examinations and test results is still relevant even if an ALJ may not base a decision solely on the lack of objective corroboration of complaints of pain." *Pierce*, 739 F.3d at 1050. "An ALJ may disregard a claimant's assertions of pain if he validly finds them not credible. Moreover, although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch*, 539 F.3d at 483 (holding that the ALJ reasonably discounted the claimant's testimony given the discrepancy between his reports of disabling gout and medical reports documenting the absence of gout symptoms, including normal ROM and ability to walk without significant limitation). Indeed, "there is no presumption of truthfulness for a claimant's subjective complaints; rather, an ALJ should rely on medical

opinions based on objective observations and not solely on a claimant's subjective assertions." *Knox v. Astrue*, 327 F. App'x. 652, 656 (7th Cir. 2009).

Unlike in *Pierce*, the ALJ did not rest her credibility determination "too heavily on the absence of objective support for [the claimant's] complaints without digging more deeply." *Pierce*, 739 F.3d at 1050. Rather, in addition to the objective medical evidence, the ALJ considered the factors listed in the regulations, including daily living activities; the duration, frequency, and intensity of the claimant's pain; the types of treatment he received; and the functional restrictions. *See Shideler*, 688 F.3d at 313.

"[E]ven a credibility determination that is partially flawed and based on factual findings that 'are a bit harsh' will be disturbed only if the ultimate conclusion is 'patently wrong.'" *Kellems v. Astrue*, 382 F. App'x 512, 516 (7th Cir. 2010) (quoting *Simila*, 573 F.3d at 517; *Berger*, 516 F.3d at 546). "[T]he standard of review employed for credibility determinations is extremely deferential, and the ALJ did provide some evidence supporting her determination. Thus, we cannot find that the ALJ's credibility determination was 'patently wrong.'" *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *see also Curvin*, 778 F.3d at 651. The ALJ's credibility decision here was supported by substantial evidence, and the errors we have identified do not render "patently wrong" her ultimate credibility decision. *Compare Bates*, 736 F.3d at 1098 (upholding the ALJ's credibility determination even though not all of the ALJ's reasons for finding the claimant's testimony regarding the extent of her chronic pain incredible were legitimate) *with Kellems*, 382 F. App'x at 516 (finding the ALJ's credibility determination was patently wrong because the ALJ's mistakes were "a significant component of his credibility determination").

## CONCLUSION

For the foregoing reasons, we deny Mr. Wheatley's request for reversal or remand (doc. # 14) and grant the Commissioner's motion to affirm the denial of disability benefits (doc. # 21). The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: January 13, 2016**